UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

UNITED STATES OF AMERICA,      )
     )
       Plaintiff,      )     No. 5:17-CR-86-DCR-REW
     )
v.      )
     )     RECOMMENDED DISPOSITION
STEVEN D. HARVEY and      )
CHRISTOPHER D. WASHINGTON,      )
     )
       Defendants.      )

\*\*\*    \*\*\*    \*\*\*    \*\*\*

Defendants Steven D. Harvey and Christopher D. Washington each filed a motion to suppress. DE ##18, 20 (Motions). The United States responded in opposition. DE #30 (Response). Harvey replied. DE #31 (Reply). The Court held a joint hearing on September 5, 2017, where it heard the sworn testimony of four witnesses and admitted three exhibits. DE #34 (Minute Entry Order). The matters are ripe for consideration. For the following reasons, the Court **RECOMMENDS** that the District Judge wholly **DENY** the dual effort to suppress (DE ##18, 20).

## I.     FACTUAL BACKGROUND AND THE TESTIMONY[1]

The motions center on the events of June 20, 2017, but the relevant background is necessary for full context. Defendant Steven Harvey had long been the target of law enforcement investigation, coordinated among or involving state and federal officials in different districts and states (including in Lexington, Louisville, and Arkansas). As relevant, in late-May 2017, the DEA learned that Harvey was allegedly trafficking

---

[1] The digital record captured the hearings, and the Court bases its analysis on facts it finds premised on that record, to include the accompanying briefing and hearing exhibits.

controlled substances (specifically, heroin) in the Lexington area (continuing similar behavior that law enforcement had investigated in 2016). The source of information told law enforcement that Harvey used Space Center Storage units to house the drugs; he would allegedly make trips to the units, pick up quantities of the substances, and distribute them to individuals throughout Lexington.

To corroborate the provided storage unit information, law enforcement used administrative subpoenas to identify the registered renters of certain storage units, ultimately tagging Mark Byrd (Harvey's father) as the renter of unit R7006 and Shana McCann as the renter of unit R3045. Law enforcement, due to prior investigation, knew the contact telephone number Ms. McCann provided to the storage center to be a number Harvey utilized. Officers conducted video surveillance and monitored use of the unique storage unit site access codes. Further, they deployed Bo, a certified LPD drug detection dog, on the units on two different dates. Bo positively alerted to both units on both occasions. During this investigation, officers placed Harvey physically on site at Space Center Storage, using the R7006 code and entering near R3045. Law enforcement ultimately obtained state search warrants for each storage unit. Upon execution—around 1:17 p.m. on June 20, 2017—officers found a large amount of heroin, bulk currency, and other evidentiary items in R3045, but no items of evidentiary value in R7006. Post-searches, Agent Moore maintained custody over the R3045 lock, but not the R7006 lock. The DEA knew the unit lessee provided the lock for each unit at the storage center.

Using cell location tracking data, around 1:45 p.m. on June 20, law enforcement established surveillance of Harvey, then at Dick's Sporting Goods at Fayette Mall, driving a Yukon. Officers observed Harvey accompanied, at least during parts of the

afternoon, by a black man later (likely) identified as Co-Defendant Christopher Washington (although police did not know the man's identity at the time). [Law enforcement could not say with absolute certainty that the black male companion during the afternoon was, in fact, Washington. All Moore said was that he had no reason to believe the companion was *not* Washington.] After Harvey left Dick's, he went to Zaxby's, returned home on Grayson Lake Drive, drove back to Zaxby's, and then returned home again. Agents affirmatively saw the man later identified as Washington arriving with Harvey at the residence. Officers surveilling the residence observed Harvey and Washington making trips in and out of the Audi parked in the driveway. Around 4:40 p.m., Harvey and Washington exited the residence together, and law enforcement moved into the scene to effectuate a probable-cause arrest of Harvey based on the storage unit heroin.

Lexington Police Department Detective Blake Leathers and a second officer approached Harvey, giving him verbal orders to go to the ground. Harvey complied. Leathers made contact, handcuffed Harvey, and began to stand him back up. When Harvey began to rise, Leathers observed a set of keys with a lanyard underneath his body. The keys, Leathers said, had been on Harvey's person, in his possession, as he was on the ground.

Lexington Police Department Detective and DEA TFO Robert Hart, without drawing his weapon, approached Washington (although Hart did not know which person he was approaching at the time) near the front passenger fender of the Audi in the driveway. Hart verbally instructed Washington to the ground; Washington complied. Hart, within moments, was straddled on top of him, applying pressure to his back. Hart

cuffed Washington's hands behind his back. During the process, while Washington was on the ground, Hart asked him "if he had any weapons"; Washington advised that he did and asked "if there was anything wrong with that." [Hart testified he had no indication Washington was armed until Washington's statement.] Hart said that the question came "during" the period of time he was cuffing Washington, in a fluid interaction, "as that procedure was going on"; Hart also testified, though, that that he did not think the cuffs were yet applied at the time of the question. Hart stated that he did not give Washington *Miranda* warnings before inquiring about weapon possession.

Hart said that, at the time, he did not know Washington and did not know his criminal history; he asked the weapon question solely for purposes of officer safety based on, according to his training and experience, a likelihood that associates of a large-scale drug trafficker (Harvey)—whom officers had previously observed armed and who has a criminal history involving firearms offenses—would likely also be armed. Hart affirmed that locating any weapons at Harvey's arrest scene was "absolutely" an officer safety issue. Even with the positive response on weapon possession, though, Hart did not immediately search Washington. He said the response "did not heighten anything" regarding their physical contact; Washington remained compliant with all instructions, and everything seemed to Hart to be under control. Law enforcement subsequently patted Washington down and located a firearm on his person. [This is the Count 2 basis.] Washington also admitted to Lexington Police Detective Danny Page, who further ran a records check of Washington's status, that he is a convicted felon.

Hart described his role as a canine handler for Bo, a USPCA-certified[2] drug detection dog. He described the applicable training regimen (including controlled deployments in rooms, on cars, and on packages) and the yearly recertification process. Hart called the USPCA the "gold standard" in canine certification. Hart has been Bo's only handler since Bo began the job. TFO Hart described the standard detection procedure he uses for Bo and stated that he is a passive alert dog—Bo sits when he positively alerts for the odor of a controlled substance. Hart testified that Bo's last recertification was in May 2017. His initial certification was in fall 2012; he has had no performance-based lapse in certification. Post-arrests on June 20, Hart deployed Bo on the Audi in the driveway, as well as the Yukon and Caprice parked on the street, parallel with the curb, in front of the home. Bo positively alerted on all three vehicles for the presence of narcotics odor; law enforcement then searched the Caprice and Yukon. Page testified that the Caprice appeared to be mobile, and Harvey had driven the Yukon earlier that very day.

After officers had secured the scene at Grayson Lake Drive, Agent Moore arrived and took possession of the keys previously found underneath Harvey. Moore located a key that fit the R3045 lock and opened the lock. He also called the number associated with the R3045 storage unit, and a phone that had been in Harvey's possession rang. Harvey disclaimed ownership of the keys and the phone. Officers arrested both men on probable cause, initiating the current case.

---

[2] USPCA stands for United States Police Canine Association.

## II.    ANALYSIS

### A.    *General Legal Principles*

The Fourth Amendment generally prohibits unreasonable searches and seizures. This case implicates several well developed Fourth Amendment doctrines.

As a starting point, the Court recognizes the "basic rule that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. McCraney*, 674 F.3d 614, 618 (6th Cir. 2012) (internal quotation marks removed). One such "recognized exception" is a search incident to arrest. *Id.* "This exception authorizes the warrantless search of the arrestee's person and the area within his immediate control." *Id.* at 618-19 (internal quotation marks removed). The search incident to arrest doctrine is "a straightforward rule" that a "lawful arrest . . . establishes the authority to search" and that "a full search of the person is reasonable in the case of a lawful custodial arrest." *United States v. Hudgins*, 52 F.3d 115, 118 (6th Cir. 1995) (quoting *United States v. Robinson*, 94 S. Ct. 467, 477 (1973) (rejecting earlier limiting language in *Chimel*)); *see also Robinson*, 94 S. Ct. at 474 (referencing "the traditional and unqualified authority of the arresting officer to search the arrestee's person"). The area "within a person's immediate control" includes "the area from within which he might gain possession of a weapon or destructible evidence." *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001). "However, the right to search an item incident to arrest exists even if that item is no longer accessible to the defendant at the time of the search. So long as the defendant had

the item within his immediate control near the time of his arrest, the item remains subject to a search incident to arrest." *Id.* (citing cases).

As is relevant on these facts, "the mere insertion of a key into a lock, by an officer who lawfully possesses the key and is in a location where he has a right to be, to determine whether the key operates the lock, is not a search." *United States v. Salgado*, 250 F.3d 438, 456 (6th Cir. 2001); *see also United States v. Stewart*, 315 F. App'x 554, 560 (6th Cir. 2009) (same). The Sixth Circuit particularly found persuasive a First Circuit case "holding that the insertion of a key into the padlock of a storage unit was not a search, or, in the alternative, was not an unreasonable search prohibited by the Fourth Amendment." *See Salgado*, 250 F.3d at 456 (describing *United States v. Lyons*, 898 F.2d 210 (1st Cir. 1990)). *Lyons* "noted that the insertion of the key into the lock of the storage unit was merely a means of identifying a storage unit to which the defendant had access," and that "it is th[e] contents that are the object of the lessee's privacy expectations, not the padlock." *Id.* (characterizing and quoting *Lyons*).

Another exception to the general rule is the so-called automobile exception. *See California v. Carney*, 105 S. Ct. 2066, 2068-69 (1985). Under the automobile exception, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Pennsylvania v. Labron*, 116 S. Ct. 2485, 2487 (1996) (per curiam). The probable cause determination (there and in all cases) generally requires a common sense, totality of the circumstances assessment of the basis for a seizure or search. *See, e.g., United States v. Torres-Ramos*, 536 F.3d 542, 554-55 (6th Cir. 2008). A court must determine whether "'the facts and circumstances within [the officers'] knowledge and of which [they] had

reasonably trustworthy information [are] sufficient to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *United States v. Hughes*, 606 F.3d 311, 320 (6th Cir. 2010) (quoting *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005)). The standard requires "more than mere suspicion" but not "evidence to establish a prima facie case . . . much less evidence sufficient to establish guilt beyond a reasonable doubt." *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998). Importantly, the probable cause standard is objective. "Subjective intentions play no role in probable cause Fourth Amendment analysis." *Schneider v. Franklin Cnty.,* 288 F. App'x 247, 251 (6th Cir. 2008) (citing *Whren v. United States*, 116 S. Ct. 1769, 1773-74 (1996)). The Court eschews hyper-technicality here and commonsensically probes and considers evidence. "If probable cause justifies a search of a vehicle . . ., then that probable cause extends to justify the search of every part of the vehicle and all containers found therein in which contraband could be hidden." *United States v. Crotinger*, 928 F.2d 203, 205 (6th Cir. 1991).

Ready mobility, a key criterion, means "[t]he mere inherent mobility of the vehicle." *United States v. Howard*, 489 F.3d 484, 494 (2d Cir. 2007) (holding an inquiry into "the proximity of the drivers and passenger to the vehicles" in an automobile exception situation to be "misplaced"); *see also United States v. Graham*, 275 F.3d 490, 510 (6th Cir. 2001) (noting that the *Labron* truck's ready mobility "was not questioned, despite the fact that . . . the defendants had been arrested outside of the truck and prior to the truck search"). Indeed, as the Sixth Circuit has directly stated, a vehicle's mere "mobility" satisfies this element. *Id.* at 511; *see also United States v. Brookins*, 345 F.3d 231, 238 (4th Cir. 2003) (holding "readily mobile" means "operational").

Further, in a dog-sniff situation, the probable cause determination is considerably more streamlined: an "alert by a properly trained and reliable drug-detection dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Winters*, 782 F.3d 289, 304 (6th Cir. 2015); *see also, e.g.*, *United States v. Sharp*, 689 F.3d 616, 618-19 (6th Cir. 2012) (same).[3] Indeed, "such probable cause extends to every part of the vehicle and all containers found therein in which the object of the search could be hidden." *Winters*, 782 F.3d at 304 (internal quotation marks removed).

Relevant to Defendant Washington, "[w]here an individual is in an area immediately adjoining the arrestee, the individual may be placed in temporary protective detention even in the absence of probable cause or a reasonable suspicion that the individual poses a threat to officer safety." *United States v. Kinzalow*, 236 F. App'x 414, 418 (10th Cir. 2007) (citing *United States v. Maddox*, 388 F.3d 1356, 1362-63 (10th Cir. 2004), which, in turn, relies on *Tennessee v. Garner*, 105 S. Ct. 1694 (1985) and *Maryland v. Buie*, 110 S. Ct. 1093 (1990)). Simply put, "the governmental interest in securing the area around [an] arrestee and protecting officers from potential danger is sufficient to justify the temporary detention of [a] bystander." *Maddox*, 388 F.3d at 1363 (internal quotation marks and alterations removed). The Sixth Circuit has directly instructed that "police have the limited authority to briefly detain those on the scene, even wholly innocent bystanders, as they execute a[n] . . . arrest warrant." *Cherrington v.*

---

[3] *See also Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013) ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs."). Officer Hart's proof stands alone regarding Bo's qualifications.

*Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) (citing *Michigan v. Summers*, 101 S. Ct. 2587, 2595 (1981)); *see also, e.g.*, *United States v. Lawrence*, No. 1:17 CR 16 SNLJ (ACL), 2017 WL 2859258, at *3-5 (E.D. Mo. July 5, 2017).

These facts also may require consideration of *Terry* principles. The general rule under *Terry v. Ohio*, 88 S. Ct. 1868 (1968), is that "'where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances.' *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994)." *United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004). Reasonable suspicion "must be supported by specific and articulable facts that would 'warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (quoting *Terry*, 88 S. Ct. at 1880). "Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity." *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016). The "standard is less demanding than the probable-cause standard." *Id.* "A determination regarding the existence of reasonable suspicion is based on the totality of the circumstances, and a reviewing court views the evidence offered in support of reasonable suspicion using a common sense approach, as understood by those in the field of law enforcement." *Id.* (internal quotation marks and alteration removed).

*Terry* also may permit a frisk / patdown—that is, "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime[.] *Terry* does not require the officer to be

absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. Because a pat-down search is for the limited purpose of ensuring the safety of the officer and others around him, the search must be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *United States v. Wilson*, 506 F.3d 488, 492 (6th Cir. 2007) (internal quotation marks and citations omitted).

      *B.  Harvey's Motion*

        1.  Probable Cause to Arrest

The Court begins, for thoroughness, with the foundation of the events of June 20: whether law enforcement had probable cause to arrest Harvey. The Court has already found that officers did. *See* DE #7 (finding "that probable cause exists to believe that Defendant committed the crime as alleged in the Complaint").

Probable cause is a common-sense, "fluid," "practical," and "nontechnical" analysis that looks (through an objective prism) to the totality of the circumstances known to law enforcement at the time. *Maryland v. Pringle*, 124 S. Ct. 795, 799-800 (2003); *Illinois v. Gates*, 103 S. Ct. 2317, 2331-33 (1983). The Court probes whether "the facts and circumstances within [the officers'] knowledge and of which [they] had reasonably trustworthy information [are] sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Hughes*, 606 F.3d at 320 (internal quotation marks removed).

Here, as before, the Court has no trouble concluding that law enforcement had probable cause to arrest Harvey on June 20, 2017, for an alleged violation of 21 U.S.C. §

841(a)(1). Indeed, Harvey does not even contest the point. Simply put, the connection between Harvey and unit R3045, where law enforcement located a large amount of heroin and other contraband, is significant and certainly passes the probable cause threshold. The ties include the nominal renter (Ms. McCann), the cell phone link (Harvey had in his possession at the time of arrest the phone associated with the number related to R3045), Harvey's possession of the key to access the unit, the SOI's confirmatory information, and Harvey's observed physical presence at the storage unit location. The Court thus reaffirms its prior conclusion that this set of circumstances established probable cause—as of the arrest date—to believe that Harvey violated 21 U.S.C. § 841(a)(1).

> 2. Seizure of a Lock, Seizure of Keys, and Subsequent Insertion of a Key into a Lock

The Court now turns to a topic that Harvey did not brief in any meaningful way, but did offhandedly mention (and which received correspondingly slight attention at the evidentiary hearing): the seizure of the storage unit locks themselves. *See* DE #31, at 2. Harvey does not, in any way, seek to invalidate the storage unit search warrant, a posture he confirmed at the hearing. As officers executed the warrant, they cut off the locks, and SA Moore maintained custody over the R3045 lock as evidence.

As a starting point, the Court "place[s] no significance on the fact that the padlock . . . had to be removed before the [unit contents] could be fully examined." *United States v. Wilson*, 524 F.2d 595, 599 (8th Cir. 1975); *see also Lyons*, 898 F.2d at 213 ("When viewed objectively, it is th[e] contents that are the object of the lessee's privacy expectations, not the padlock."). Courts harmoniously endorse the physical severance of a lock from the item or place it secures in the course of a lawful search of that item or

place. *See, e.g.*, *United States v. Jackson*, 120 F.3d 1226, 1228-29 (11th Cir. 1997) ("[A] warrant to search a specific area for a certain class of things authorizes government agents to break open locked containers which may contain the objects of the search."); *United States v. Kyles*, 40 F.3d 519, 523-24 (2d Cir. 1994) ("Officers may force open a locked door on the premises if they have probable cause to believe the objects sought are behind it. . . . Accordingly, the agents were authorized to break the lock and search the room[.]"); *United States v. Becker*, 929 F.2d 442, 446 (9th Cir. 1991) (holding search warrant authorized agents' "use of a jackhammer to search beneath [a] concrete slab"); *United States v. Morris*, 647 F.2d 568, 572-73 (5th Cir. Unit B 1981) (holding a search warrant for a home authorized search of "a locked jewelry box" contained in the home). Physically cutting the locks off the storage units to effectuate the search warrant's authorization did not contravene the Fourth Amendment. Harvey does not contest this.

Neither did law enforcement's post-search retention of the R3045 lock. The state warrant (which, again, Harvey does not challenge) expansively authorized seizure of "items that would tend to indicate the illegal possession of, illegal use [of,] or illegal trafficking in a controlled substance[.]" DE #20-2, at 1. A lock securing the entry to a storage unit containing heroin certainly qualifies as an item of evidentiary value in the drug investigation. As law enforcement confirmed on the stand, the lock is evidentiary because controlling access to the storage unit quite reasonably evidences control over the contents of that storage unit—here, heroin. Identifying whether a person has a key that fits a lock securing a heroin hideaway has obvious evidentiary worth.

Separate from the warrant basis,[4] "[i]f an article is already in plain view," as the lock was, "neither its observation nor its seizure would involve any invasion of privacy." *Horton v. California*, 110 S. Ct. 2301, 2306 (1990). Accordingly, "[i]t is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Id.* The prime example is a "situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Id.* at 2307. The Sixth Circuit, distilling the Supreme Court's guidance, has held application of the plain view exception to require "four factors": that (1) "officers be legally present," (2) officers "see something that immediately appears to be evidence," (3) "the item seized must actually be in plain view," and (4) "the officer must also have a lawful right of access to the object itself." *United States v. McLevain*, 310 F.3d 434, 439 (6th Cir. 2002) (internal quotation marks removed); *see also United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (similar 4-part test). The parties do not address this basis for lock seizure in the briefing, but the United States referenced it at the hearing and all four factors are present: the officers

---

[4] Admittedly, the seizure authorization in the state warrant is of less than perfect clarity. Quoting the totality, the warrant authorized seizure of: "Heroin and other narcotics, notes, letters, writings documents [sic], photographs, monies, safes, weapons, and or [sic] paraphernalia. These items that would tend to indicate the illegal possession of, illegal use [sic] or illegal trafficking in a controlled substance in violation of the Kentucky Revised Statute." DE #20-2, at 1. The second "sentence" is actually a fragment, and it arguably (though Harvey does not argue it), through use of the word "these," merely intends to describe or restate the previous list of items subject to seizure. The Court concludes that the interpretation previously espoused is the better one, though, because (1) the more natural reading is for the fragment to be a separate, more expansive seizure authorization instead of essentially a nullity, merely restating and adding nothing to what the warrant already authorized; and (2) the alternative, limited reading has inherent absurdities, such as Judge Thornton allegedly describing heroin itself as an "item that would tend to indicate the illegal possession of" heroin. The Court finds it incredible that Judge Thornton, as she crafted the warrant, would state her authorization in a nonsensical way. Due to the possible interpretive room, however, the Court alternatively analyzes the plain view exception.

were legally present at the storage units (indeed, they had warrants to search them), they saw a lock that immediately appeared to have evidentiary value (per the logic expressed above and on the stand), the seized lock was actually in plain view (SA Moore said so), and the officers had a lawful right of access to the lock (per the warrant authorization analysis above). Accordingly, regardless of the posture as to the textual warrant seizure authorization, law enforcement validly seized the R3045 lock pursuant to the plain view exception. The exterior lock on a container storing contraband is subject to plain view seizure.

The Court now turns to the seizure of the keys from Harvey's person at the time of arrest, a topic of greater briefing attention. Seizure of the keys was lawful pursuant to the search incident to lawful arrest doctrine, which authorizes the warrantless search of an arrestee's person and the area within his immediate control. *McCraney*, 674 F.3d at 618-19. The area "within a person's immediate control" includes "the area from within which he might gain possession of a weapon or destructible evidence." *Northrop*, 265 F.3d at 379. "However, the right to search an item incident to arrest exists even if that item is no longer accessible to the defendant at the time of the search. So long as the defendant had the item within his immediate control near the time of his arrest, the item remains subject to a search incident to arrest." *Id.* (citing cases). The search incident to arrest doctrine authorizes seizure of any subject items. *See, e.g.*, *Davis v. Robbs*, 794 F.2d 1129, 1131 (6th Cir. 1986).

Here, Detective Leathers testified that he discovered the keys directly underneath Harvey after raising him up from the ground, the location of Harvey's handcuffing. Immediately prior to Harvey going to the ground, per Leathers, the keys had been in

Harvey's possession—on his person. The area directly underneath a person being raised from the ground obviously is an area within that person's immediate control, and Harvey "had the [keys] within his immediate control near the time of his arrest." *Northrop*, 265 F.3d at 379. Whether the keys were still accessible to Harvey at the time of their seizure is of no consequence in the analysis. *Id.*; *United States v. Romero*, 452 F.3d 610, 619-20 (6th Cir. 2006) (holding, applying this principle, that the district court's "conclusion" that "that the search of the hotel nightstand violated the Fourth Amendment because Santiago had already been restrained by the time the officers searched the nightstand, and therefore Santiago would have been unable to reach the nightstand at the time of the search" was "erroneous" because "the law does not require that an area be accessible to the defendant at the time of a search incident to arrest for the search to be valid"). Finally, as the Court previously determined, Harvey's arrest was lawful. Accordingly, the search incident to arrest doctrine permitted law enforcement's seizure of the keys. *See also United States v. Shelton*, 742 F. Supp. 1491, 1495-96 (D. Wyo. 1990) (collecting cases for the proposition that police may seize keys from a person during a search incident to arrest).

Finally, the Court addresses the subsequent insertion of the keys into the lock. Happily, the Sixth Circuit has provided clarity in this area of the law: "the mere insertion of a key into a lock, by an officer who lawfully possesses the key and is in a location where he has a right to be, to determine whether the key operates the lock, is not a search." *Salgado*, 250 F.3d at 456; *see also Stewart*, 315 F. App'x at 560 (same); *Lyons*, 898 F.2d 210. Officers, pursuant to the above analysis, lawfully possessed the keys and the lock. SA Moore was inarguably in a location where he had a right to be. [Harvey

certainly does not contest that discrete point.] Accordingly, Moore's insertion of a key into the retained lock was not a search and thus did not violate the Fourth Amendment.

### 3. Searches of the Yukon and Caprice

Next, the Court addresses the searches of the Yukon and Caprice,[5] which the automobile exception legitimizes. Under the automobile exception, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Labron*, 116 S. Ct. at 2487.

First, each vehicle was "readily mobile." Each was capable of moving, all the requirement demands. *Graham*, 275 F.3d at 511; *Howard*, 489 F.3d at 494; *Brookins*, 345 F.3d at 238. Harvey had driven the Yukon around Lexington earlier that same day, and the Caprice was parked on the street, parallel to the curb, ostensibly ready to be driven at any time. Page directly testified that the Caprice appeared mobile, and the video (which the Court viewed during the hearing) undoubtedly showed a Caprice on all four wheels that appeared capable of movement; Harvey certainly presented no contrary evidence. An inquiry into the defendants' proximity to the vehicles at the time—which defense counsel urged—has no place in the ready mobility analysis, which probes solely the vehicle's inherent potential for movement.

Second, probable cause existed to believe each vehicle contained contraband. An "alert by a properly trained and reliable drug-detection dog is sufficient to establish probable cause for the presence of a controlled substance." *Winters*, 782 F.3d at 304; *see*

---

[5] The extent to which Harvey challenges the Caprice search is frankly unclear, from the briefing. *See, e.g.*, DE ##20, at 1 (Harvey seeking suppression of "[a]ll items seized from Harvey's GMC Yukon"); 31, at 4 (Harvey stating that the Caprice is "not his" but that "if it was," he'd seek suppression). The Court includes the Caprice in its analysis for completeness.

*also, e.g.*, *Sharp*, 689 F.3d at 618-19 (same). As with any probable cause analysis, a court employs the totality-of-the-circumstances when evaluating a dog's credentials and reliability. *Harris*, 133 S. Ct. at 1056. Bo, whom the uncontradicted proof indicates is properly certified by a bona fide organization and who regularly, recently, and successfully completed controlled training, positively alerted to narcotics odor at both vehicles, providing a full basis for a search. *See Winters*, 782 F.3d at 304; *Harris*, 133 S. Ct. at 1057 ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.").[6] The record and Hart's testimony establish Bo's certifications and qualifications, and the Court finds Bo to be properly trained, reliable, and fully qualified to accurately alert to the presence of the odor of controlled substances. Bo has passed muster before. *See, e.g.*, *United States v. Johnson*, No. 5:16-CR-44-DCR-REW, 2016 WL 3693327, at *11 (E.D. Ky. June 30, 2016), *adopted by* 2016 WL 4154345 (E.D. Ky. Aug. 5, 2016). Hart's credentialing testimony stands alone and validates Bo as a suitable probable cause indicator. The totality of the evidence clearly establishes that Bo is a reliable and certified drug

---

[6] There were hints—though no actual argument—at the suppression hearing that defense counsel would attempt to denigrate Bo's reliability through the canine's positive alert at R7006, when no controlled substances were actually located in that unit. Counsel never actually attempted this, but any such effort would plainly fail. Bo alerts merely to the *odor* of narcotics, which may endure post-narcotics-removal from an area. There is no basis to doubt Bo's reliability based on his positive alert to unit R7006.

detection dog. Accordingly, per this analysis, law enforcement's searches of the Yukon and Caprice fit within the automobile exception and did not violate the Constitution.[7]

### C. Washington's Motion[8]

#### 1. Temporary Detention as Officers Arrest Harvey

As to Defendant Washington, the Court first addresses law enforcement's authority to temporarily detain him as officers arrested Harvey. Law enforcement had such authority: "police have the limited authority to briefly detain those on the scene, even wholly innocent bystanders," as officers effectuate an arrest. *Cherrington*, 344 F.3d at 638 (citing *Summers*, 101 S. Ct. at 2595). Indeed, "[w]here an individual is in an area immediately adjoining the arrestee, the individual may be placed in temporary protective detention even in the absence of probable cause or a reasonable suspicion that the individual poses a threat to officer safety." *Kinzalow*, 236 F. App'x at 418. "[T]he governmental interest in securing the area around [an] arrestee and protecting officers from potential danger is sufficient to justify the temporary detention of [a] bystander." *Maddox*, 388 F.3d at 1363. "[E]ven absent particularized reasonable suspicion, innocent bystanders may be temporarily detained where necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others." *Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011). "Inherent in" such authorization "is the authority to use reasonable force to effectuate the detention." *See Muehler v. Mena*, 125 S. Ct. 1465, 1470

---

[7] Defense counsel also argued at the evidentiary hearing that *Arizona v. Gant*, 129 S. Ct. 1710 (2009), controls this issue. That is simply wrong. *Gant* involved application of the search incident to arrest doctrine in the vehicular context, not application of the automobile exception.

[8] Washington raises no argument regarding his statement to Page concerning his criminal history; the basis for continued detention post-frisk, post-firearm-seizure, or post-Harvey-arrest-completion; or his probable cause arrest. The Court confines its analysis to the issues Washington (giving a liberal construction) actually presents.

(2005) (concluding the use of handcuffs was reasonable). Based on these principles and cases, the Court easily concludes that law enforcement acted validly here in detaining Washington (including ordering him to the ground and applying handcuffs),[9] as a person in an area directly adjoining the scene of active-dealer Harvey's arrest, without suspicion of criminal activity on Washington's part, for purposes of officer safety, as officers arrested Harvey.[10] *Cf., e.g.*, *Burchett v. Kiefer*, 310 F.3d 937, 943 (6th Cir. 2002) ("Detaining such individuals prevent[s] flight, minimize[s] the risk of harm to officers and others, and facilitate[s] the orderly completion of the search.").

    2.  Frisk

Finally, the Court addresses the legality of law enforcement's frisk of Washington, which led to discovery of the firearm on his person.[11] In many ways, this is

---

[9] Defendant mounts no challenge to any particular element or type of force used. Indeed, defense counsel conceded at the evidentiary hearing that police "maybe" could validly order Washington to the ground and "probably" could handcuff him "for the safety of the officers." *See* Audio File KYED-LEX__5-17-CR-86-DCR-REW-1,2_20170905_095929, at 1:43:20-1:44:00. Counsel particularly isolated officers "going over there and patting [Washington] down" as the police action that offended the Constitution. *Id.*

[10] This is different from *United States v. Bell*, 762 F.2d 495 (6th Cir. 1985), which defense counsel cited at the hearing and the Court addresses in more detail below. *Bell* indeed did reject an "automatic companion" rule that would permit an automatic *Terry* frisk of all companions of an arrestee. The temporary detention that cases allow in this context differs from a *Terry* frisk, which the Court addresses next.

[11] In DE #18, Washington sought suppression of "all evidence discovered by law enforcement on his person on June 20, 2017, the date of his arrest." DE #18, at 1. Textually, that broad statement encompasses more than suppression of the firearm—including, *e.g.*, the digital scales and an amount of United States currency located elsewhere on his person. The scales and cash are not particularly part of any defensive briefing argument and were not part of argument at the evidentiary hearing. Page testified that he discovered the scales and cash only after conducting a "search" of Washington's person following discovery of his criminal history—*i.e.*, that officers did *not* discover the items during the *Terry* patdown. Any suppression effort vis-à-vis the scales and cash would raise a host of issues unaddressed in the briefing and at the hearing. The Court considers only what the parties have presented, which here does not fairly include consideration of suppression merits regarding the scales and cash. Those pieces might not be relevant to Count 2 anyway, but the Court does not decide that.

the closest issue either motion presents. The Court perceives the issue to be whether law enforcement, during the lawful Harvey-arrest-based temporary detention of Washington, developed reasonable suspicion that Washington was armed and dangerous, so as to permit a "*Terry* patdown" or "*Terry* frisk."[12]

Officers have several "independent bases to search for weapons and protect themselves from danger," for officer safety is a "legitimate and weighty" concern. *Knowles v. Iowa*, 119 S. Ct. 484, 488 (1998). As one example, they may "perform a 'patdown' of a [person] upon reasonable suspicion that [he] may be armed and dangerous." *Id.* (citing *Terry*, 88 S. Ct. 1868). Indeed, the Supreme Court recently confirmed that, if the detention basis is lawful, an officer may "proceed . . . to a frisk" if he "harbor[s] reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009); *see also, e.g.*, *Ybarra v. Illinois*, 100 S. Ct. 338, 343 (1979); *United States v. Noble*, 762 F.3d 509, 521-22 (6th Cir. 2014); *United States v. Johnson*, 246 F. App'x 982, 986 (6th Cir. 2007); *United States v. Richardson*, 700 F. Supp. 2d 1040, 1048 (N.D. Ind. 2010) (describing the first condition as whether the defendant's "temporary detention" is "lawful"); *United States v. Dorlette*, 706 F. Supp. 2d 290, 298 (D. Conn. 2010) ("[T]he Supreme Court has permitted

---

[12] The Court does not perceive that officers had reasonable suspicion that Washington had been involved in criminal activity, *at the time of the frisk*. There is no suggestion that his simple possession of a firearm—without knowledge of his criminal history (which Hart did not know at the time of the frisk)—was itself a crime, *see Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1132-33 (6th Cir. 2015), and officers readily admitted on the stand that they observed no illegality while Washington accompanied Harvey during the afternoon of June 20. Law enforcement could point to no facts that Washington himself was involved in the drug trade.

conduct—usually, but not always, a frisk—based on a concern for officer safety *only after* an otherwise lawful seizure has occurred." (emphasis in original)).[13]

Here, per the prior analysis, the basis for Washington's temporary detention during the Harvey arrest was valid—*i.e.*, his temporary seizure at the scene of Harvey's arrest was lawful. Police, properly moving to arrest Harvey, also encountered and had to account for his associate Washington in the same immediate space. The question then becomes whether law enforcement developed reasonable suspicion that Washington was armed *and* dangerous. "Reasonable suspicion is based on the totality of the circumstances, and it exists if a reasonably prudent person in the circumstances would be warranted in the belief that his or her safety or that of others was in danger. This standard is an objective one." *Noble*, 762 F.3d at 521-22 (internal quotation marks, alterations, and citations omitted). "Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis[.]" *Collazo*, 818 F.3d at 257. The "standard is less demanding than the probable-cause standard." *Id.*

The Court begins with the baseline that, when considering Washington's statement to Hart that he (Washington) had a weapon on his person, law enforcement certainly had reasonable suspicion to believe that Washington was armed. Indeed, Washington had just told them so.

What about, though, reasonable suspicion that Washington was *dangerous*? The Sixth Circuit has made it clear that carrying a firearm *alone* does not *automatically*

---

[13] *See also, e.g.*, *Bennett v. City of Eastpointe*, 410 F.3d 810, 841 (6th Cir. 2005) ("Counsel may shout 'officer safety' until blue-in-the-face, but the Fourth Amendment does not tolerate, nor has the Supreme Court or this Court ever condoned, pat-down searches without some specific and articulable facts to warrant a reasonable officer in the belief that the person detained was armed and dangerous."); *United States v. Bearden*, 213 F. App'x 410, 416 (6th Cir. 2007) ("The concern for officer safety is not a Fourth Amendment carte-blanche, but the safety of officers is of very high importance[.]").

indicate dangerousness. *Northrup*, 785 F.3d at 1132; *see also United States v. Robinson*, 846 F.3d 694, 709-10 (4th Cir. 2017) (en banc) (Harris, J., dissenting) (including the Sixth Circuit, citing *Northrup*, in a list of courts, "against a backdrop of state laws that routinely permit the public possession of firearms," that hold "that a *Terry* frisk requires reasonable suspicion that a person is both armed and a danger to the safety of officers or others" (internal quotation marks removed)). On these facts, and although the Court considers the issue a relatively close call, the Court concludes that law enforcement did have reasonable suspicion to believe Washington was also dangerous.

Consider what Hart knew at the time he frisked Washington:

(1) Hart knew or reasonably perceived that Washington was a close associate of Harvey, having potentially spent the better part of an afternoon driving around Lexington with the known drug dealer. At the very least, Hart knew that Washington was an associate of Harvey's, having arrived in the same vehicle with Harvey at Harvey's residence. Law enforcement could not say with certainty that Washington had accompanied Harvey during the full afternoon—only that an unidentified black man did—but SA Moore confirmed on the stand that officers had no reason to suspect the associate accompanying Harvey during the afternoon was anyone other than Washington, who ultimately arrived at the house with Harvey.

(2) Hart knew that Harvey, in addition to actively distributing heroin in Lexington, had previous convictions for firearm and drug offenses, and that officers had observed Harvey with a firearm on his person just months prior.

Hart's 25 years of training and experience, as he confirmed on the stand, told him that associates of armed drug dealers likely are themselves armed.

(3) Hart knew that Washington had arrived at Harvey's residence with Harvey and that officers had seen the pair make several trips in and out of the Audi in the driveway.

(4) Once detained during Harvey's arrest, Washington provided the key detail that he, in fact, was armed, confirming what Hart's training and experience told him was likely the case.

Again, the reasonable suspicion analysis turns on the totality, and it is an objective test. Would a reasonably prudent officer in Hart's circumstances be warranted in the belief that his or her safety or that of others was in danger? The Court answers that question, in these circumstances, affirmatively. A reasonably prudent officer, dealing with a fast-developing (the Court viewed the video for itself at the evidentiary hearing) scene of a probable cause arrest of a large-scale heroin trafficker, previously observed carrying a firearm, would be warranted in the belief that an associate of that drug dealer (Washington), who confirmed having a weapon on his person, mere steps away from the arrest scene, represented a danger.

Again, the Court does not purport to endorse "that an individual may be frisked based upon nothing more than an unfortunate choice of associates." *Bell*, 762 F.2d at 499; *see also id.* at 499 n.4. Here, though, law enforcement had more than simply Washington's associational choice—they had (1) a close relationship, likely surveilled throughout June 20 (and, at the very least, an association close enough for the two men to arrive at Harvey's residence in the same vehicle and enter the home), with a known drug

dealer (with confirmed large quantities of heroin found in a storage unit associated with him that very day); (2) several trips in and out of the vehicle once both individuals arrived at Harvey's residence; (3) Harvey's prior observed firearm possession and criminal history that included firearm-related offenses; and (4) most critically, Washington's admission to possessing a weapon. *See, e.g.*, *id.* at 500 (favorably citing Cherry's "close association with [a co-defendant], who was known to traffic in handguns" as a factor supporting reasonable suspicion). Officers' "general experience," including that "weapons might be involved" when dealing with drug dealers are to be credited and given "due weight." *Id.* Indeed, Hart "was not obliged to ignore the fact that [Washington] was in the company of a man known to be potentially armed and dangerous in assessing the potential risk posed by [Washington] himself." *Id.* at 501. "[T]he fact of companionship, while not itself justifying a frisk, [i]s permissibly considered in analyzing whether there was reasonable cause to believe that [Washington] was potentially armed and dangerous." *Id.*; *see also, e.g.*, *United States v. Lyons*, 733 F.3d 777, 782 (7th Cir. 2013). Police, simply put, "need not ignore the insights gleaned from their experience on the beat." *United States v. Grogins*, 163 F.3d 795, 798 (4th Cir. 1998). Hart's insights here—based on 25 years of law enforcement experience—told him that associates of drug dealers would likely be armed, and "police c[an] reasonably infer that [Harvey] may have transferred his predilection for violence to others[.]" *Id.* at 799. The Court concludes, considering the totality of these quite specific circumstances, that law enforcement had particularized, reasonable suspicion that Washington was armed, and also dangerous, legitimizing the frisk and subsequent discovery of the firearm.[14] Having a gun is one

---

[14]     The Court concludes by again emphasizing that this case represents a somewhat close call on the individualized and particularized reasonable suspicion analysis. Either

thing. Having a gun in the company of a known heroin trafficker, in circumstances indicative of an intimate association, is another, and an intrinsically more dangerous context. Add to that the arrest situation and dynamic. Hart saw an "absolute" safety component, and the Court agrees. It would be dangerous indeed for police, in a circumstance with these particulars, to be allowed to detain an arrest bystander and yet not be able to disarm such a bystander also known to be armed.

This leaves one final topic to briefly discuss—the propriety of considering Washington's weapon-possession statement—which potentially implicates *Miranda*[15]

---

an associational choice or firearm possession alone and separately, the Sixth Circuit instructs, does not amount to reasonable suspicion, but the Court concludes, for the reasons stated, that the totality here coalesces to cross the low reasonable suspicion threshold.

The Court, though, explicitly cautions law enforcement in general that a blanket, indiscriminate policy of patting down individuals merely physically present at an arrest scene—or individuals merely accompanying a known drug dealer—or individuals who admit mere firearm possession—all without more—does not comport with the Fourth Amendment, which, as the cases cited demonstrate, demands a particularized analysis. The Court views Hart, in this case, as coming near to articulating an "automatic companion" rule of his own on the stand; in fact, he admitted in response to a question from the Court that he "believe[d]" he would have patted Washington down regardless of his answer to the weapon possession question—a hypothetical circumstance that would make this already difficult fact pattern considerably more so. *See* Audio File KYED-LEX__5-17-CR-86-DCR-REW-1,2_20170905_095929, at 36:41 (The Court: "Was he going to be patted down regardless?" Hart: "I believe so, yes sir."); *see also id.* at 35:00 (Hart: "*Any time* somebody's with them [a drug trafficker], generally one goes hand in hand with the other [referring to controlled substances and firearms]." (emphasis added)); DE #20-3 (DEA Report indicating "Washington was patted down for weapons" simply as part of ("[d]uring") "his detainment" (one instance of all caps removed)). Officers had no suspicion of Washington committing a crime, and the cases demand they justify a patdown with specific and articulable facts amounting to reasonable suspicion that the subject is armed and dangerous. Umbrella, indiscriminate policies or practices, in the circumstances, do not suffice. TFOs operating in Kentucky, such as Hart, should take particular heed of the difference in applicable state and federal law on the subject. Kentucky adopted a variant or limited version of the "automatic companion" rule, *see Owens v. Commonwealth*, 291 S.W.3d 704, 709 (Ky. 2009), while the Sixth Circuit rejected it.

[15] *Miranda v. Arizona*, 86 S. Ct. 1602 (1966) (holding that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of

issues. The Court hesitates to even broach the topic, since *Miranda* went uncited in the briefs and unargued at the evidentiary hearing. However, counsel did question law enforcement on whether Mirandizing occurred, and the Court considers touching on the issue as necessary to a full and fair analysis.

    *Miranda* "set forth rules of police procedure applicable to 'custodial interrogation.'" *Oregon v. Mathiason*, 97 S. Ct. 711, 713 (1977) (per curiam). Each element of that phrase—custody and interrogation—has particular meaning under *Miranda*. For *Miranda* purposes, "custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Field*, 132 S. Ct. 1181, 1189 (2012) (internal quotation marks, citation, and alteration removed). Likewise, *Miranda* "interrogation" has a particularized meaning: as relevant here, "express questioning . . . that the police should know [was] reasonably likely to elicit an incriminating response[.]" *Rhode Island v. Innis*, 100 S. Ct. 1682, 1689 (1980). "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Id.* at 1690. To be sure, "police officers are not required to administer Miranda warnings to everyone whom they question." *Mathiason*, 97 S. Ct. at 714 (no italics in original). A defendant seeking statement suppression has the burden of establishing custodial interrogation. *See United*

---

the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination").

*States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)).

Here, at a minimum, and without the benefit of adversarial briefing or argument, the Court concludes that Hart's question to Washington about weapon possession was not an "interrogation" for *Miranda* purposes.[16] Hart had no basis for knowing that asking Washington—a man, remember, whose identity and criminal history Hart did not know—if he (Washington) had a weapon on his person, in the fast-paced setting of officers securing an arrest scene, was reasonably likely to elicit an incriminating response. *Cf., e.g.*, *United States v. Woods*, 711 F.3d 737, 742 (6th Cir. 2013) (holding that the question, "What is in your pocket?" was not intended to elicit incriminating information); *United States v. Robinson*, 217 F. App'x 503, 509 (6th Cir. 2007) ("Defendant's statements about the locations of the firearms were made in response to brief questioning that was done for the limited purpose of the officers' safety.") (affirming no-*Miranda*-violation conclusion); *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007) ("[W]hen officers ask questions necessary to secure their own safety or the safety of the public as opposed to questions designed solely to elicit testimonial evidence from a suspect, they do not need to provide the warnings required by *Miranda*." (internal quotation marks removed)); *United States v. Durrah*, 384 F. App'x 970, 972 (11th Cir. 2010) ("Durrah's statements at the arrest site were not made in response to custodial interrogation.").

Indeed, firearm possession—*alone*—is not criminal activity, and Hart knew nothing of the man later identified as Washington's criminal history at the time of the

---

[16] It is thus unnecessary to evaluate whether Washington was in "custody" for *Miranda* purposes. Even assuming he was in custody, the conclusion as to "interrogation" suffices to resolve the possible *Miranda* issue.

question. Hart's question was, thus, not designed to incriminate Washington; rather, it was designed to probe possible bases for officer danger and enable Hart to act in furtherance of ensuring officer safety. *Bachynski v. Stewart*, 813 F.3d 241, 246 (6th Cir. 2015) (stating that interrogation includes questioning "designed to ferret out the suspect's involvement in the case" or designed "to obtain a response to use at trial"); *United States v. Sydnor*, No. 16-21-ART-HAI-(2), 2017 WL 772341, at *4 (E.D. Ky. Feb. 28, 2017); *United States v. Williams*, 272 F. App'x 473, 478 (6th Cir. 2008) ("Davis's question was not posed as an investigatory interrogation, but rather as an attempt to prevent Williams from gaining access to a dangerous weapon."); *United States v. Miles*, 82 F. Supp. 2d 1201, 1211 (D. Kan. 1999) ("Officer Cochran's question 'Whose gun is this?' was not interrogation within the meaning of *Miranda*." Instead, "the question primarily served a legitimate investigatory purpose wholly apart from an attempt to elicit an incriminating statement from Miles."); *United States v. Duncan*, 308 F. App'x 601, 612 (3d Cir. 2009) ("When an officer asks just one question directed at uncovering the threat and then stops, . . . [t]his indicate[s] that the officer's question sought to eliminate a threat, not obtain evidence."); *United States v. Webster*, 162 F.3d 308, 332 (5th Cir. 1998) ("[P]olice acted constitutionally when they asked Webster whether he had any needles in his pockets that could injure them during their pat down; such questioning, needed to protect the officers, does not constitute interrogation under *Miranda*[.] Accordingly, Webster's response, indicating that he had marihuana in his pocket, was not obtained in violation of *Miranda* and was fully admissible."); *United States v. Everett*, 601 F.3d 484, 494-95 (6th Cir. 2010) (endorsing that officers "may inquire about dangerous weapons" during temporary detention due to the "legitimate and weighty" interest of "the safety of the officer").[17] Per

---

[17] Additionally, the Court notes, without analyzing applicability (due to the parties'

these cases and principles, the Court concludes that Hart asking Washington, with no knowledge of Washington's criminal history, during the course of detaining Washington on the scene of a probable cause arrest of an associated drug dealer, if Washington had a weapon on him, was not an "interrogation" for *Miranda* purposes. It was not a question Hart knew, or should have known, was reasonably likely to elicit an incriminating response; rather, it was a question, as Hart himself emphatically confirmed on the stand, tailored specifically to ensuring officer safety in the fluid dynamic of the probable cause arrest of a large-scale drug dealer. Accordingly, *Miranda* does not bar the answer's use, and the Court properly considers it.

## III.    CONCLUSION

Per the above analysis, law enforcement acted within the bounds of the law in all respects in this case.[18] The Court thus **RECOMMENDS** that the District Judge wholly **DENY** the joint effort to suppress (DE ##18, 20).

*    *    *    *    *

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. As discussed at the hearing, and to maintain each Defendant's current schedule, Defendant **Harvey** must file any objection(s) by **September 13, 2017**, with any response(s) due by **September 14, 2017**. Defendant **Washington** must file any objection(s) by **September 18, 2017**, with

---

complete paucity of consideration of this topic), the *Miranda* public safety exception, which perhaps could apply here to legitimize the weapon-possession question, even if Hart did violate *Miranda*. *See, e.g.*, *Williams*, 483 F.3d at 428-29.

[18] Because the Court so concludes, it need not engage in a separate analysis of the propriety of suppression (or any possibly applicable exceptions). Because law enforcement acted within the law in this case, there is no improperly obtained evidence to exclude and no deliberate, reckless, or grossly negligent police conduct to deter. *See Davis v. United States*, 131 S. Ct. 2419, 2427-28 (2011); *Herring v. United States*, 129 S. Ct. 695, 702 (2009).

any response(s) due by **September 21, 2017**. The parties should consult the statute and Federal Rule of Criminal Procedure 59(b) for specific appeal rights and mechanics. Failure to object in accordance with the Rule waives a party's right to review.

This the 11th day of September, 2017.

Signed By:

Robert E. Wier

United States Magistrate Judge